FILED

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

2015 SEP 14 P 3: 06

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |  |
|---|---|---|
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CASE NO. 1:15CV1176 JCC/IDD |
| DAVID RIDENOUR, LAURA RIDENOUR, BEATRICE BRUNO, and BIG ISLAND, LITTLE HANDS LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Cigna Health and Life Insurance Company ("Cigna") hereby files this Complaint against Defendants David Ridenour, Laura Ridenour, Beatrice Bruno, and Big Island, Little Hands LLC (collectively, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.     The Defendants have engaged in a scheme, both individually and in concert with each other and with others known and unknown, to defraud Cigna through a variety of misrepresentations and fraudulent claims related to occupational therapy services that were purportedly provided by Defendant Beatrice Bruno individually, and through her company Big Island, Little Hands LLC, for the benefit of the minor child of Defendants David Ridenour and Laura Ridenour, B.R.[1], from in or around May 2011 and continuing to the present.

2.     The Defendants have executed this fraudulent scheme by, among other manners and means: (1) misrepresenting, and causing others to misrepresent, the number of hours of

---

[1] The Ridenour's child is a minor and is thereby referenced by his initials B.R., pursuant to Federal Rules of Civil Procedure, Rule 5.2(a)(3).

occupational therapy services actually provided to B.R., (2) misrepresenting, and causing others to misrepresent, the purported medical necessity of the occupational therapy services allegedly provided to B.R., (3) inflating, and causing others to inflate, the number of hours that were purportedly medically necessary for occupational therapy services for B.R., (4) inflating, and causing others to inflate, the hourly rate for occupational therapy services to a level that exceeded the usual, customary, and reasonable rate for an occupational therapist of Ms. Bruno's experience and seniority, (5) consciously avoiding seeking medical information related to B.R. that would exclude or limit coverage for the benefits sought, (6) denying, and causing others to deny, Cigna access to information necessary to determine, among other things, the medical necessity of the occupational therapy services and of the number of hours of such services allegedly provided for B.R., (7) filing a lawsuit against Cigna in federal district court in the Northern District of California for allegedly failing to pay and delaying payment of claims related to B.R.'s occupational therapy services, and (8) exchanging kickbacks amongst each other, in the form of, among other things, a Cadillac Escalade SUV and free housing as inducement to continue the fraudulent scheme.

3.      By means of this fraudulent scheme, the Defendants have been unjustly enriched and unlawfully obtained, jointly and severally, at least $539,000 from Cigna and the benefit plan it serves.   Those funds were reimbursed by Cigna to Defendant David Ridenour, who was a participant in a medical benefits plan sponsored by his employer, Orrick, Herrington & Sutcliffe LLP, and which was insured by Cigna (the "Plan").   At all times relevant to this action, Defendant Beatrice Bruno was a nonparticipating provider under the Plan.   Fees for her purported services were paid directly to her (or through her company, Defendant Big Island,

Little Hands LLC) by Defendants David Ridenour and Laura Ridenour, either in cash or by credit card.

4.      Defendants David Ridenour and Laura Ridenour subsequently submitted, and caused to be submitted, false and misleading claims to Cigna through the Plan for reimbursement of Defendant Bruno's purported "services."  Cigna would not have reimbursed Defendant David Ridenour for those claims had it been aware of the Defendants' scheme and the false and misleading nature of the claims.

5.      In this action, Cigna seeks to recover the payments directly and indirectly made to the Defendants and to enjoin the Defendants from continuing to engage in their fraudulent scheme against Cigna.

## THE PARTIES

6.      Plaintiff Cigna is a company organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut.

7.      Defendant David Ridenour ("Mr. Ridenour") is a Senior Associate in the Washington, D.C. office of the law firm Orrick, Herrington & Sutcliffe, LLP ("Orrick").  Mr. Ridenour is an attorney licensed to practice law in the Commonwealth of Virginia and the District of Columbia.  Mr. Ridenour resides in Loudoun County within the Alexandria Division of the Eastern District of Virginia.

8.      Defendant Laura Ridenour ("Mrs. Ridenour") is the spouse of Defendant David Ridenour.  Mrs. Ridenour resides in Loudoun County within the Alexandria Division of the Eastern District of Virginia.

9.     Defendant Beatrice Bruno ("Ms. Bruno") has been a licensed pediatric occupational therapist since 2006. Upon information and belief, Ms. Bruno currently resides in Loudoun County within the Alexandria Division of the Eastern District of Virginia.

10.     Defendant Big Island, Little Hands LLC ("BILH") is a limited liability company formed in the Commonwealth of Virginia by Ms. Bruno. BILH purports to be a private pediatric occupational therapy practice. The Virginia State Corporation Commission lists the principal office of BILH in Arlington, Virginia, within the Alexandria Division of the Eastern District of Virginia. Ms. Bruno is the registered agent for BILH.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over the parties because Defendants Mr. Ridenour, Mrs. Ridenour, Ms. Bruno, and BILH are located in the Commonwealth of Virginia and because all Defendants systematically and continually conduct business in the Commonwealth of Virginia and otherwise have minimum contacts with Virginia sufficient to establish personal jurisdiction.

12.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, Cigna asserts claims in this case that arise under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, et seq. ("ERISA"). This Court has jurisdiction over Cigna's remaining claims pursuant to 28 U.S.C. § 1367 because the state and common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

13.     In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between Plaintiff and the Defendants, and the

- 4 -

amount in controversy substantially exceeds $75,000.   Cigna is a company organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut. Defendants Mr. Ridenour, Mrs. Ridenour, Ms. Bruno, and BILH are residents of the Commonwealth of Virginia.  With respect to all the Defendants, Cigna has suffered or will suffer substantially in excess of $75,000 in damages as a result of the Defendants' actions described herein.

14.     Venue is proper in the Eastern District of Virginia because all the Defendants may be found in this judicial district, and a substantial part of the events giving rise to the claims in this action occurred in this District.  29 U.S.C. § 1132(e)(2), 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### *ing that MsMedical Benefits Plan*

15.     The Orrick, Herrington & Sutcliffe LLP Welfare Benefit Plan is an ERISA-governed plan that provides medical benefits to Orrick employees and their dependents.

16.     Mr. Ridenour is a participant in the Plan.  As a participant, Mr. Ridenour knew or should have known of the Plan terms, including those described in the following paragraphs.

17.     Certain types of treatment are specifically excluded under the terms of the Plan, including, among other things, (1) "care required by state or federal law to be supplied by a public school system or school district," (2) "charges which [a participant is] not obligated to pay or for which [the participant is] not billed or which [the participant] would not have been billed except that they were covered under [the Plan]," (3) "assistance in the activities of daily living, including but not limited to eating, bathing, dressing, or other Custodial Services or self-care activities, [and] homemaker services," and (4) "nonmedical counseling or ancillary services, including but not limited to Custodial Services, education, training, . . . behavioral training . . .

- 5 -

educational therapy or other nonmedical ancillary services for learning disabilities, developmental delays or mental retardation."

18.    Further, under the terms of the Plan, no expenses are reimbursed for care or treatment that is not "Medically Necessary," which, under the Plan are services "determined by the [Cigna] Medical Director to be required to diagnose or treat an illness, injury, disease or its symptoms; in accordance with generally accepted standards of medical practice; clinically appropriate in terms of type, frequency, extent, site and duration; not primarily for the convenience of the patient, Physician or other health care provider; and rendered in the least intensive setting that is appropriate for the delivery of the services and supplies."

19.    Under the terms of the Plan, covered expenses include charges for professional services and treatment programs related to Autism, but only when certain stringent criteria are met.    Specifically, the Autism treatment must be prescribed by a licensed Physician or Psychologist, the Autism treatment must be provided by a Qualified Autism Service Professional, and the Autism treatment plan must have "measurable goals over a specific timeline," which is reviewed at least every 6 months and modified when appropriate.    The Plan excludes from coverage any Autism treatment plan that is used for purposes of providing/reimbursing "respite care, day care, or educational services."

20.    Under the terms of the Plan, certain mental health services are covered.    However, excluded from the Plan's coverage of mental health services are services for "developmental disorders, including but not limited to, developmental reading disorders, developmental arithmetic disorders, developmental language disorders or developmental articulation disorders." Also excluded from mental health coverage is counseling for activities of an "educational nature," and counseling for "borderline intellectual functioning."

- 6 -

21.     Under the terms of the Plan, short-term rehabilitative therapy that is part of a rehabilitative program, including physical, speech, and occupational therapy is covered. However, excluded from such coverage is "maintenance or preventative treatment consisting of routine, long term or non-Medically Necessary care provided to prevent recurrences or maintain the patient's current status."

22.     Under the terms of the Plan, excluded from Plan coverage are "charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan." The Plan also provides that "[w]hen an overpayment has been made by Cigna, Cigna will have the right at any time to: recover that overpayment from the person to whom or on whose behalf it was made; or offset the amount of that overpayment from a future claim payment."

### B.R's injury and medical evaluation

23.     B.R. is the minor child of Mr. Ridenour and Mrs. Ridenour. B.R. is currently six years old. As Mr. Ridenour's dependent, B.R. is a beneficiary under the Plan.

24.     On or about September 3, 2009, when he was 7 months of age, B.R. fell from a three-foot bathroom vanity counter at the Ridenours' residence. The fall caused B.R. to suffer an occipital skull fracture, ███████████████████████████████████████████
████████████████

25.     ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

26.    At all times relevant to this action, ███████████████ was a pediatrician affiliated with a pediatric physicians group located in Northern Virginia.  ██████████ was B.R.'s pediatrician.  Upon information and belief, ████████████ is a general pediatrician and does not have any specialized training in pediatric neurosurgery.

27.    At all times relevant to this action, ███████████ was a participating provider with Cigna by virtue of his affiliation with his pediatric physicians group.   The pediatric physicians group and Cigna entered into a Provider Group Services Agreement, whereby the group and its physicians (including ████████████) agreed to provide covered services to plan participants consistent with the terms of the Provider Agreement and Cigna's Administrative Guidelines. The Provider Agreement required, among other things, that ███████████ "comply with [Cigna's] Administrative Guidelines" and "comply with the requirements of and participate in Quality Management as specified in the Administrative Guidelines."

28.    Under Cigna's Administrative Guidelines, participating providers agree to the Quality Management program activities, which include, among other things: (1) reviewing performance against the key quality indicators as identified in the quality work plan; (2) providing information about the quality and cost efficiency of participating health care professionals and hospitals to facilitate more informed decision-making by Cigna participants; (3) evaluating participant and health care professional satisfaction information; and (4) evaluating access to services provided by the plan and its contracted physicians and hospitals.

29.     Participating providers also agree to submit to the process of peer review, which is a review conducted by Cigna medical directors to help uncover substandard or inappropriate care, or inappropriate professional behavior, by a practitioner.

30.     The Quality Management program is a critical component of the managed care system that allows companies such as Cigna to control overall health care costs and increase the quality of medical care.  Without Quality Management—and the cooperation of participating providers in Quality Management efforts—medically unnecessary and fraudulent claims will be processed, dramatically increasing the cost of medical care and decreasing the availability of quality resources for those participants most in need of medical attention.

31.     At all times relevant to this action, █████████, as a participating provider with Cigna, was obligated to cooperate with Cigna's Quality Management program and with the process of peer review.

### B.R.'s rehabilitative therapy and the fraudulent scheme

32.     Beginning in or around 2010, pursuant to ███████████ prescription, B.R. allegedly began receiving rehabilitative services, including occupational and speech therapy. This therapy was purportedly directed at addressing "global impairments" that B.R. allegedly suffered as a result of a "severe traumatic brain injury" (which no physician has ever diagnosed) and at improving B.R.'s physical and cognitive abilities and to prevent other developmental disorders.

33.     From on or about November 4, 2010 to on or about December 14, 2010, B.R. allegedly received speech therapy, for which Cigna denied benefits as being not medically necessary.

34.   On July 21, 2011, Mr. Ridenour submitted a request for an independent medical review ("IMR") to the California Department of Insurance ("DOI").  IMR was established by the California Legislature in 2001 and is a process whereby consumers have an opportunity for an independent external review of coverage denials by state-regulated health plans when a specific treatment has been denied as having been medically unnecessary or experimental/investigational.

35.   On October 17, 2011, the IMR determined that speech therapy was medically necessary for B.R. and that Cigna's denial should be overturned for all prior and prospective dates of service.  Notably, however, the IMR's decision only reversed Cigna's determination as to the medical necessity of B.R.'s speech therapy.  The IMR did not address the medical necessity of any other rehabilitative service for B.R., including but not limited to, occupational therapy services.

36.   Upon receiving the IMR's decision, the Ridenours' claims for reimbursement submitted to Cigna, for services purportedly provided to B.R. for both speech therapy and occupational therapy, increased significantly.

37.   For example, upon information and belief, B.R. began receiving occupational therapy services in or about May 2011 at a private clinic located in Annandale, Virginia, called Skill Builders LLC.  In early 2011, the Ridenours submitted approximately one claim per week for therapy services performed at Skill Builders, in the amount of $120 per session.  However, after the IMR decision was issued in October 2011, the number of claims that the Ridenours submitted for services from Skill Builders significantly increased, sometimes to multiple claims per week.

38.     Ms. Bruno was employed by Skill Builders as an occupational therapist at the time that B.R. began receiving services from that practice group.  Upon information and belief, Ms. Bruno earned approximately $30 per hour for her work at Skill Builders.

39.     Beginning in or around May 2012, Mr. Ridenour and Mrs. Ridenour invited Ms. Bruno to perform private occupational therapy services for B.R., which were to be rendered on the weekends at the Ridenours' residence.  These services were rendered in addition to the services that B.R. was already receiving at Skill Builders.

40.     Upon information and belief, Ms. Bruno's employment contract with Skill Builders allowed her to provide such "moonlighting" services either to current patients or non-patients, but only if the patient lived outside a specific geographic proximity to Skill Builders' Northern Virginia locations.  Mr. Ridenour and Mrs. Ridenour lived within that designated proximity, and therefore, Ms. Bruno's "moonlighting" services for the Ridenours violated her employment contract with Skill Builders.

41.     Mr. Ridenour and Mrs. Ridenour offered to pay Ms. Bruno up to $200 per hour for these private "services," which was over six times what Ms. Bruno was earning from her employment at Skill Builders.  The $200 hourly rate exceeded the usual, customary, and reasonable rate for an occupational therapist of Ms. Bruno's experience and seniority.

42.     Mr. Ridenour and Mrs. Ridenour subsequently submitted, and caused to be submitted, to Cigna claims for reimbursement for the "services" that Ms. Bruno purportedly provided for B.R. during these private sessions.

43.     In or around June 2012, Ms. Bruno quit her job at Skill Builders, with the intention of moving to Hawaii.  In or around April 2012, Ms. Bruno had registered Defendant

BILH as a limited liability company in Virginia, with the intention of using BILH to carry on a private occupational therapy practice in Hawaii.

44.     In truth and in fact, BILH was never used to service any clients other than B.R. and the Ridenour family.  Indeed, upon information and belief, BILH and Ms. Bruno had no clients other than B.R. and the Ridenour family.

45.     On or about June 26, 2012, upon learning about Ms. Bruno's intention to move to Hawaii, Mrs. Ridenour offered Ms. Bruno a contract to postpone her move for one year to work intensively with B.R. for 20-30 hours per week.  Mrs. Ridenour offered to pay Ms. Bruno $200 per hour, which would result in an annual compensation of approximately $300,000.  Mrs. Ridenour also offered to allow Ms. Bruno to live in the Ridenours' au pair suite free of charge.

46.     Ms. Bruno accepted the Ridenours' offer, with the knowledge and understanding that the Ridenours would be reimbursed for her expenses by Mr. Ridenour's insurance company (i.e., Cigna).

47.     Mr. Ridenour and Mrs. Ridenour subsequently submitted, and caused to be submitted, to Cigna claims for reimbursement for the "services" that Ms. Bruno purportedly provided for B.R. during the period of her contract.

48.     However, upon information and belief, a significant portion of Ms. Bruno's time that was included on these claims for reimbursement was not for occupational therapy services, as the claims purported, but was for time that Ms. Bruno spent grocery shopping, babysitting the Ridenours' three other young children, and providing other housekeeping and "nanny-related" functions that had nothing to do with occupational therapy services, as the Defendants knew.

49.     The Defendants knew that the reimbursement claims submitted to Cigna were false and misleading.

50.     Upon information and belief, Ms. Bruno understood that the benefits that the Ridenours were eligible to receive from their insurance company were far greater if B.R. was considered as having a "severe traumatic brain injury" than if he had been diagnosed with autism.

51.     Upon information and belief, in order to maintain the benefits that the Ridenours were receiving from Cigna as full reimbursement for Ms. Bruno's "services," the Ridenours consciously avoided seeking medical information related to B.R. that would exclude or limit coverage for the benefits they sought to obtain from Cigna.  That included, among other things, instructing their physicians, including ███████████, not to have B.R. assessed for the diagnosis of autism, and refusing to allow those same physicians to assess B.R. for the diagnosis of autism.

52.     Mr. Ridenour and Mrs. Ridenour, individually and in concert, consciously avoided seeking the aforementioned medical information related to B.R.—and misled Cigna into believing that he was suffering from a "severe traumatic brain injury"—in order to defraud and to unjustly enrich themselves at the expense of the Plan and the Plan's insurer, Cigna.

53.     The Ridenours subsequently used those funds to pay for services provided by Ms. Bruno that had nothing to do with occupational therapy, including but not limited to: grocery shopping, babysitting, and providing housekeeping and other "nanny-related" services.

54.     Ms. Bruno knowingly and intentionally participated in the Ridenours' fraudulent scheme in order to personally enrich herself.  Upon information and belief, Ms. Bruno used the proceeds of the fraudulent scheme to purchase, among other things:

    a.  Cadillac Escalade SUV for the Ridenour family, as an inducement for the Ridenours to continue the fraud;

    b.  Fees to hire a personal trainer to prepare her for triathlons;

      c. An expensive road bike; and

      d. Fees and travel expenses associated with her participation in triathlons.

55.     Defendant BILH was used as a means for the other Defendants to carry out the fraudulent scheme. The proceeds of the fraudulent scheme, including the payments by the Ridenours to Ms. Bruno, were made to or ultimately deposited into accounts associated with BILH. The use of BILH further assisted the Defendants in concealing their scheme by making their fraudulent transactions appear more legitimate.

### *Mrs. Ridenour and B.R. move to Hawaii with Ms. Bruno*

56.     Upon information and belief, in or around April 2013, Ms. Bruno moved to Hawaii. Mrs. Ridenour moved to Hawaii as well, along with B.R. and the Ridenours' three other children. Mr. Ridenour did not move to Hawaii with his family, but stayed in the Northern Virginia area and continued his employment at the Washington, D.C. office of Orrick.

57.     In return for Mrs. Ridenour moving to Hawaii with her, and as inducement to the Ridenours to continue the fraudulent scheme, Ms. Bruno purchased a Cadillac Escalade SUV for Mrs. Ridenour's personal use in Hawaii.

58.     Ms. Bruno, Mrs. Ridenour, B.R., and the three other Ridenour children continued to live in Hawaii until 2014. During that same time period, Mr. Ridenour and Mrs. Ridenour submitted, and caused to be submitted, to Cigna claims for reimbursement of the "services" that Ms. Bruno purportedly provided for B.R. These claims totaled $7,000 per week, which was purportedly for 35 hours of occupational therapy services that were being provided by Ms. Bruno at the inflated rate of $200 per hour.

59.     Upon information and belief, Ms. Bruno did not provide 35 hours per week of occupational therapy for B.R. Much of the time that she spent with the Ridenour family was to

perform basic household chores, such as grocery shopping, fixing broken items around the house, babysitting, and other "nanny-related" functions.

60.     From May 2012 through April 2015, Mr. Ridenour and Mrs. Ridenour submitted, and caused to be submitted, a total of approximately 110 claims to Cigna for occupational therapy services purportedly provided to B.R. by Ms. Bruno and BILH.  In total, the Ridenours have submitted claims to Cigna for Ms. Bruno's purported services in an amount exceeding $820,000.  Of that amount, Cigna has paid the Ridenours at least $539,000.

### Cigna's conducts an investigation and obtains an independent medical report

61.     In or around October 2013, Cigna's Special Investigations Unit ("SIU") began an audit of the Ridenours' claims.  The purpose of this audit was to obtain verification of those claims from the various providers named in the claim submissions.

62.     Cigna mailed letters requesting information about services rendered to B.R. to several providers, including: Skill Builders, Ms. Bruno, and ████████████.  Mr. Ridenour and Mrs. Ridenour were aware that Cigna had requested this information.

63.     Upon information and belief, Mr. Ridenour and Mrs. Ridenour instructed all of B.R's health care professionals (occupational therapists, speech therapists, and ████████████) not to discuss B.R.'s care with Cigna and not to respond to Cigna's repeated requests for information.

64.     On April 16, 2014, Mr. Ridenour and Mrs. Ridenour submitted, and caused to be submitted, an IMR request to the California DOI. On April 29, 2014, the IMR determined that occupational therapy prescribed by ████████████ was medically necessary for B.R.  However, nothing in the IMR's report assessed the completeness of ████████████ prescription, the thoroughness of his examination of B.R., his qualifications to render the prescription, or whether

- 15 -

there was evidence of sufficient documentation of B.R.'s progress that continued to justify the prescribed treatment.

65.    In September 2014, Cigna obtained an independent peer review report from ▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉ board certified in Physical Medicine and Rehabilitation, with a sub-specialty in Pediatric Rehabilitation Medicine.   ▉▉▉▉▉▉ reviewed the medical records associated with B.R., including those records that related to Ms. Bruno's alleged provision of occupational therapy services for B.R.

66.    ▉▉▉▉▉▉ report concluded that:

a.  Some of the services that were allegedly being provided by Ms. Bruno to B.R. were not occupational therapy, but instead were educational in nature, which federal law required be addressed in the school system.

b.  Ms. Bruno's records did not adequately document the number of hours of service that was allegedly performed on B.R. ▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

c. The prescribed regimen of 30 to 35 hours per week of occupational therapy was "not appropriate and excessive" for a child of B.R.'s age. ███████ concluded that "the frequency and duration of this occupational therapy are extremely excessive. The standard occupational therapy regimen is to provide skilled therapy one to two times per week. In addition, it is the responsibility of the therapist to provide a home program that can be completed on a daily basis with the patient and family. Occasionally, a child may receive an episode of intensive occupational therapy. This would involve one to two hours per day for two to three weeks. Twenty to thirty five hours per week is not appropriate and is excessive."

d. Ms. Bruno did not follow national standards (including the American Association of Occupational Therapy) on documenting the progress of her treatment for B.R. ███████ noted that "the medical necessity of ongoing therapy depends upon making measurable progress in functional goals." In this case, Ms. Bruno had not documented such progress, ███████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████

e. The services being provided by Ms. Bruno were not medically necessary, given that ████████████████████████████████████
████████████████████

*The Ridenours thwart Cigna's efforts to obtain information from* ▮▮▮▮▮▮

67.    Upon receiving ▮▮▮▮▮ report, Cigna has made numerous attempts to contact ▮▮▮▮▮ to obtain further clarification, information, and documentation supporting his prescription of 30 to 35 hours per week of occupational therapy services for B.R.

68.    In a letter dated November 10, 2014, ▮▮▮▮▮ confirmed to Cigna that in April 2014, he had prescribed "35 hours per week of Rehabilitative Therapy ("bundled" treatment which includes, but is not limited to, Occupational Therapy)" for B.R.

69.    In a subsequent call with a Cigna Medical Director in or about November 2014, ▮▮▮▮▮ acknowledged that he did not assess the results of the prescribed treatment because such an assessment would require the skills of a neurodevelopmental pediatrician, which he was not. ▮▮▮▮▮ further acknowledged that he was only seeing B.R. on an annual basis for routine pediatric check-up appointments.

70.    In a letter dated November 25, 2014, to ▮▮▮▮▮, a Cigna Medical Director requested additional information on the medical basis for ▮▮▮▮▮ decision to prescribe up to 35 hours of rehabilitative therapy, or "bundled treatment," for a child of B.R.'s young age. Among other things, the letter asked (1) whether there was any literature that supported his prescription, (2) what portion of the 35 hours of "bundled treatment" ▮▮▮▮▮ intended to be prescribed for occupational therapy, (3) why he did not prescribe the more usual schedule of 2-3 hours per day, two to three times per week, (4) whether he had ever ordered or monitored a treatment plan of 35 hours per week of "bundled treatment" or occupational therapy for any other young child; and (5) the dates of ▮▮▮▮▮ most recent examinations and treatments of B.R. over the past two years.

71.   In a letter dated December 10, 2014, ▮▮▮▮▮ responded that he had "received correspondence from [B.R.'s] parents, which I have enclosed, expressly requesting that I release no information about [B.R.] to Cigna without their permission." ▮▮▮▮▮ further wrote that "In my many years of practice, I have never encountered a situation like this. We frequently share treatment information and rationale with a patient's health insurance provider—and would be happy to do so here—but I am now faced with getting parental permission for my responses to your inquiry." ▮▮▮▮▮ further added that "In my opinion, and based on my prior experience with this family, [B.R.'s] parents will desire to have substantial input into my responses and the information I provide. For this reason, I am concerned that such 'approved' responses may not be well received by Cigna or may be viewed as not responsive." ▮▮▮▮▮ included a copy of an email that Mr. Ridenour sent to ▮ ▮▮▮▮▮ personal e-mail address advising ▮▮▮▮▮ not to release information about B.R. without his permission.

72.   ▮▮▮▮▮ explained that he would follow the Ridenours' direction and not answer Cigna's questions about the basis for his prescription of 30 to 35 hours per week of rehabilitative services.

73.   Mr. Ridenour and Mrs. Ridenour have therefore caused ▮▮▮▮▮ to be in violation of his Provider Agreement and Cigna's Administrative Guidelines. They have done so in order to further conceal truthful information that would expose their ongoing scheme to defraud Cigna.

### Surveillance of the Ridenours' residence in Virginia confirms the fraudulent scheme

74.   In 2014, Cigna hired a private surveillance company to determine if the activity around the Ridenours' residence supported Mr. Ridenour's claims that Ms. Bruno was rendering

occupational therapy services on the dates and for the amount of time that were billed on the claims for reimbursement. That surveillance confirmed that the Ridenours' reimbursement claims to Cigna inflated the number of hours that Ms. Bruno was actually rendering occupational therapy services. For example, the surveillance revealed the following:

    a. On September 29, 2014, surveillance was performed for approximately 9 hours. Ms. Bruno was present for approximately 6 hours; however, Cigna received a claim for 7 hours of service for this date.

    b. On September 30, 2014, surveillance was performed for approximately 13 hours. There was no indication of Ms. Bruno at the Ridenours' residence. Ms. Bruno was observed periodically at her own residence. However, Cigna received a claim for 7 hours of service for this date.

    c. On October 1, 2014, surveillance was performed for approximately 8 hours. Ms. Bruno was present at the home for approximately 4 hours; however, Cigna received a claim for 6 hours of service for this date.

    d. On October 2, 2014, surveillance was performed for approximately 8 hours. Ms. Bruno was present at the home for approximately 5 hours; however, Cigna received claims for 7 hours of service for this date.

### Mr. Ridenour files a lawsuit against Cigna in California

75.    Notwithstanding the conduct described above, Mr. Ridenour, on July 1, 2015, filed a lawsuit in federal district court for the Northern District of California alleging causes of action under ERISA against Cigna for the alleged failure by Cigna to pay and timely pay benefits for B.R.'s treatment, in an amount exceeding $335,000. *See Ridenour v. Cigna Health and Life Insurance Co.*, 3:15-cv-3051-LB (N.D. Cal., July 1, 2015).

76.     As Mr. Ridenour knew, and at minimum should have known as a licensed attorney with over ten years of experience, his allegations are without merit in light of the fraudulent scheme described above.

77.     Mr. Ridenour has filed the above-referenced lawsuit in an effort to further conceal and draw attention away from the fraudulent scheme described in this Complaint.

## COUNT I: FRAUD

78.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

79.     Each of the Defendants have made a number of false and misleading representations (directly and indirectly) to Cigna, including but not limited, to the following: (a) misrepresenting that Ms. Bruno provided 7 hours of occupational therapy on days on which they knew, or should have known, that Ms. Bruno had provided less than 7 hours of occupational therapy, or no services at all; (b) misrepresenting the aggregate amount of occupational therapy provided; (c) inflating the hourly rate for occupational therapy services to a level that exceeded the usual, customary, and reasonable rate for an occupational therapist of Ms. Bruno's experience and seniority, (d) misrepresenting the purpose for which occupational therapy was provided; (e) misrepresenting the nature of Ms. Bruno's services; (f) misrepresenting to ███ ███ and other medical providers that they were not permitted to discuss B.R.'s treatment with Cigna; (g) misrepresenting that the services provided by Ms. Bruno were covered at the amount billed, when they were not; and (h) failing to disclose the facts about the arrangement and relationship between the Ridenours and Ms. Bruno necessary in order to make their other representations not misleading.

80.     Such false and misleading representations were material with respect to Cigna's claims handling, and the decisions to actually pay the Ridenours and refrain from engaging in additional investigation and/or legal action sooner.

81.     Such false and misleading representations were made by Defendants knowingly and intentionally with the intent to mislead Cigna.

82.     Cigna detrimentally relied upon such false and misleading representations by, among other things, paying the Ridenours at least $539,000 and refraining from engaging in additional investigation and/or legal action sooner.

83.     Cigna has been damaged by Defendants' false representation in that it has paid money that was not owed, and has incurred significant expenses and lost productivity as a result of the various investigations and claim processing mandated by such false representations.

## COUNT II: AIDING AND ABETTING FRAUD

84.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

85.     Each of the Defendants committed fraud against Cigna by making a number of false and misleading representations (directly and indirectly) to Cigna including but not limited to the misrepresentations described in Paragraph 79 above.

86.     Each of the Defendants knowingly and substantially assisted, encouraged, incited, aided, and abetted each other in committing, continuing, and concealing the fraudulent conduct, including but not limited to the following:

> a.   Ms. Bruno purchased a Cadillac Escalade SUV for Mr. Ridenour and Mrs. Ridenour for their personal use in Hawaii as an inducement for the Ridenours to continue the fraud.

b. Ms. Bruno provided false and misleading records of the purported occupational therapy services that she performed on B.R., for the purpose of having Mr. Ridenour and Mrs. Ridenour submit those records as support for their reimbursement claims to Cigna.

c. As an inducement for Ms. Bruno to continue the fraud against Cigna, Mr. Ridenour and Mrs. Ridenour offered a contract to Ms. Bruno: (1) to pay her $200 per hour—a rate that exceeded the usual, customary, and reasonable rate for an occupational therapist of Ms. Bruno's experience and seniority—resulting in an annual compensation of $300,000, and (2) to live in the Ridenours' au pair suite free of charge.

d. BILH allowed the other Defendants to direct the proceeds of the fraudulent scheme to BILH. The use of BILH substantially assisted the other Defendants in concealing their scheme by making their fraudulent transactions appear more legitimate.

## COUNT III: NEGLIGENT MISREPRESENTATION

87. The preceding paragraphs are incorporated by reference as if set forth fully herein.

88. In the alternative, the false and misleading representations made by each of the Defendants (directly and indirectly) to Cigna including but not limited to the misrepresentations described in Paragraph 79 above, were made negligently.

89. Cigna detrimentally relied upon such false and misleading representations by, among other things, paying the Ridenours at least $539,000 and refraining from engaging in additional investigation and/or legal action sooner.

90.     Cigna has been damaged by the Defendants' false and misleading representations in that it has paid money that was not owed, and has incurred significant expenses and lost productivity as a result of the various investigations and claim processing mandated by such false representations.

## COUNT IV: UNJUST ENRICHMENT

91.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

92.     The Defendants submitted, and caused to be submitted, claims for reimbursement to Cigna for Ms. Bruno's purported occupational therapy services provided to B.R. that contained false and misleading representations, that included but are not limited to the misrepresentations described in Paragraph 79 above.

93.     The Plan excludes from coverage "charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan."

94.     The claims that the Defendants submitted and caused to be submitted are not covered under the Plan because the claims are based on false, misleading, and fraudulent charges submitted to Cigna.  Among other things, the Defendants' claims are charges that "would not have been billed except that they are covered under this plan."

95.     Cigna detrimentally relied upon the Defendants' false and misleading claims for reimbursement.  The Defendants' false and misleading representations caused Cigna to pay, and allowed the Defendants to receive, at least $539,000 that the Defendants were not entitled to receive under the Plan.

96.     The Defendants have not returned any portion of the money that Cigna paid on claims submitted for occupational therapy services that were allegedly provided for B.R. by Ms. Bruno. The Defendants would be unjustly enriched were they allowed to retain these payments to which they are not entitled.

## COUNT V: CIVIL CONSPIRACY

97.     The preceding paragraphs are incorporated by reference as if set forth fully herein.

98.     The Defendants combined with each other and others known and unknown to accomplish, by concerted action, a fraudulent scheme whereby they received money from Cigna for services that were never performed or were performed in an excessive amount.

99.     As discussed in the paragraphs above, this fraudulent scheme involved and was carried out through manner and means that included, among other things:  billing for services when no services were performed at all; billing for occupational therapy services in an amount exceeding the amount of occupational therapy services provided; billing for occupational therapy services in excess of what was appropriate; inflating the hourly rate for occupational therapy services to a level that exceeded the usual, customary, and reasonable rate for an occupational therapist of Ms. Bruno's experience and seniority; consciously avoiding seeking medical information related to B.R. that would exclude or limit coverage for the benefits sought; and failing to disclose the facts about the arrangement and relationship between the Ridenours and Bruno necessary in order to make their other representations not misleading.

100.    This fraudulent scheme was perpetrated for the unlawful purpose of obtaining money from Cigna which was not due.

101.   Cigna has been damaged by the Defendants' unlawful conspiracy in the amount of approximately $539,000 plus expenses and other resources associated with the investigation and claim handling necessitated by the conspiracy.

## COUNT VI: ERISA (29 U.S.C. § 1132(a)(2))

102.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

103.   Under ERISA, a person is a fiduciary to the extent he "exercises any authority or control" over plan assets.

104.   The Defendants were not eligible to receive, but did directly receive, approximately $539,000 paid to Mr. and Mrs. Ridenour (and indirectly received by Ms. Bruno and BILH) as Plan benefits because, as alleged in more detail above, they submitted claims for services never actually performed and for a volume of services billed that was not appropriate in this context.

105.   It is a breach of fiduciary duty for a fiduciary to hold plan assets for his (or her) own use or to appropriate plan assets for his/her own benefit.  Defendants have breached and are continuing to breach fiduciary duties to the Plan by improperly holding Plans assets for their own benefit.  Specifically, Mr. Ridenour insisted on receiving Plan assets himself and disbursing those assets to Ms. Bruno, who was knowingly overbilling and providing services not covered by the Plan.

106.   Plaintiff has been damaged by these breaches of fiduciary duty in the amount of approximately $539,000.

107.   Pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), and ERISA § 409, 29 U.S.C. § 1109, Defendants are each personally liable to make good to the Plan its losses resulting

from the fiduciary breaches discussed above, including disgorgement of any profits they have earned through this improper use of plan assets.

## COUNT VII: ERISA (29 U.S.C. § 1132(a)(3))

108.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

109.   Under ERISA, a civil action may be brought by a fiduciary to obtain appropriate equitable relief to redress violations of Title I of ERISA or enforce Title I or ERISA.

110.   Plaintiff is a Plan fiduciary in its capacity as administrator of the Plan.

111.   Title I of ERISA provides that plan assets must be held in trust, and held for the exclusive purpose of providing benefits to participants.

112.   Defendants are not entitled to the Plan assets they have received, and their use of such assets for their own benefit is a violation of Title I of ERISA, and is remediable under 29 U.S.C. § 1132(a)(3).

113.   Further, Defendants are not entitled to the Plan assets they have received under the Plan's terms, which may require retroactive termination of coverage, as a result of their fraud and intentional misrepresentations, and the Plan terms are enforceable under 29 U.S.C. § 1132(a)(3).

114.   Cigna is entitled to an injunction enforcing the Plan terms, ERISA's trust and exclusive purpose provisions, restitution, the imposition of a constructive trust and recovery for unjust enrichment.

## COUNT VIII: DECLARATORY RELIEF

115.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

116.    Under the Declaratory Judgment Act, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

117.    The Defendants submitted, and caused to be submitted, claims for reimbursement to Cigna for Ms. Bruno's purported occupational therapy services provided to B.R. that are false and misleading, in that the claims, among other things: (a) misrepresented that Ms. Bruno provided 7 hours of occupational therapy on days on which they knew, or should have known, that Ms. Bruno had provided less than 7 hours of occupational therapy, or no services at all; (b) misrepresented the aggregate amount of occupational therapy provided; (c) inflated the hourly rate for occupational therapy services to a level that exceeded the usual, customary, and reasonable rate for an occupational therapist of Ms. Bruno's experience and seniority, (d) misrepresented the purpose for which occupational therapy was provided; (e) misrepresented the nature of Ms. Bruno's services; and (f) failed to disclose the facts about the arrangement and relationship between the Ridenours and Ms. Bruno necessary in order to make their other representations not misleading.

118.    The Plan excludes from coverage "charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan."

119.    As described in the preceding paragraphs, the claims the Defendants submitted and caused to be submitted are not covered under the Plan because the claims are based on false, misleading, and fraudulent charges submitted to Cigna. Among other things, the Defendants' claims are charges that "would not have been billed except that they are covered under this plan."

120.    An actual controversy exists between the Defendants and Cigna regarding, among other things: whether the claims for reimbursement to Cigna for Ms. Bruno's purported occupational therapy services provided to B.R. are covered and payable under the Plan, whether the number of hours per week of purported occupational therapy services for which the Defendants seek reimbursement is medically necessary, and whether the hourly rate for Ms. Bruno's purported occupational therapy services for which the Defendants seek reimbursement is usual, customary, and reasonable.

121.    Cigna seeks a declaration that the claims for reimbursement to Cigna for Ms. Bruno's purported occupational therapy services provided to B.R. are not covered and not payable under the Plan.

122.    Cigna also seeks a declaration that the Defendants must return all sums received from Cigna related to claims for reimbursement to Cigna for Ms. Bruno's purported occupational therapy services provided to B.R.

### JURY DEMAND
### (As to Non-ERISA Claims Only)

123.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

124.    With respect to the Cigna's non-ERISA claims, Cigna hereby demands a trial by jury.

## REQUEST FOR RELIEF

Cigna requests relief as follows:

(a) That Cigna be granted judgment against Defendants in the total amount of all damages suffered by it as a result of Defendants' wrongful acts, including pre-judgment and post-judgment interest;

(b) That Defendants be ordered to make restitution for the amount of the money improperly received by them, including pre-judgment and post-judgment interest;

(c) That Defendants be enjoined from instituting any legal or administrative action or complaints for the purpose of recovering any money as a result of services provided by Ms. Bruno;

(d) That Cigna be granted a declaration that the Defendants are not entitled to receive any payment on claims for reimbursement to Cigna for Ms. Bruno's purported occupational therapy services provided to B.R.;

(e) That Cigna be granted judgment against Defendants for all costs of this action, including reasonable attorney fees and costs of court; and

(f) That this Court grant Cigna such other and further relief as it considers just and equitable under the circumstances.

Dated:  September 14, 2015

Respectfully submitted,

Marianne Roach Casserly
Virginia Bar No. 45254
Edward T. Kang *(pro hac vice admission pending)*
Alston & Bird LLP
950 F Street, N.W.
Washington, DC  20004
Telephone: (202) 239-3379
Facsimile: (202) 654-4989
marianne.casserly@alston.com
edward.kang@alston.com

*Counsel for Cigna Health and Life Insurance Company*